Daroczi v. VT. Center for the Deaf    CV-02-440-JM  01/28/04

**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE**


Chrystal Daroczi

    v.

Vermont Center for the Deaf &
Hard of Hearing, Inc. d/b/a
The Austine School for the Deaf

                             Civil No. 02-440-JM
                             Opinion No. 2004 DNH 027


**O R D E R**


Chrystal Daroczi alleges in this action that Vermont Center for the Deaf & Hard of Hearing, Inc. d/b/a The Austine School for the Deaf ("Austine") negligently hired, retained, and supervised an employee who sexually harassed and attempted to molest her. The Court has for consideration Defendant's Motion for Summary Judgment (document no. 19), and Defendant's Motion to Strike Portions of Plaintiff's Errata Sheet, Affidavit and Additional Statement of Material Facts (document no. 27). As discussed herein, the Court denies the motion to strike because the evidence Defendant challenges is admissible under the applicable rules. Additionally, the Court denies the motion for summary judgment, which argues that Plaintiff cannot establish harm sufficient to recover on a claim of negligently caused emotional distress, because the Plaintiff's damages claim against the

Defendant is in fact, not premised on the tort of negligent infliction of emotional distress. Plaintiff's claim instead is premised on the Defendant's direct liability, in negligence, for its employee's intentionally tortious conduct. There is no requirement that a plaintiff offer expert testimony to support a claim for damages caused by an intentional tort.

I.   Summary Judgment Standard

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue is one "that properly can be resolved only by a finder of fact because [it] . . . may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). A material fact is one that affects the outcome of the suit. See id. at 248.

"Summary judgment is a procedure that involves shifting burdens between the moving and the nonmoving parties." LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993). The moving party bears the initial burden of establishing that there

2

is no genuine issue of material fact.  See Celotex Corp. v.

Catrett, 477 U.S. 317, 323 (1986).  If that burden is met, the

opposing party can avoid summary judgment only by providing

properly supported evidence of disputed material facts that would

require trial.  Id. at 324.  Evidence that is "merely colorable,

or is not sufficiently probative" will not preclude summary

judgment.  Anderson, 477 U.S. at 249-50 (citation omitted); see

also, LeBlanc, 6 F.3d at 842 ("the nonmoving party must establish

a trial-worthy issue by presenting enough competent evidence to

enable a finding favorable to the nonmoving party.").

On a motion for summary judgment, the court construes the

record in the light most favorable to the non-moving party,

resolving all inferences in its favor, and determines whether the

moving party is entitled to judgment as a matter of law.  Carroll

v. Xerox Corp., 294 F.3d 231, 237 (1st Cir. 2002).  The court

does not credit the nonmoving party's "conclusory allegations,

improbable inferences, and unsupported speculation."  Medina-

Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir.

1990).  Applying this standard, the facts are recited below.[1]

---

[1]Defendant filed a statement of undisputed material facts in
support of its motion for summary judgment.  In response,
Plaintiff filed a statement of disputed facts, and additional
material facts, with her opposition.  Defendant argues in its

II.  Background

Daroczi is a completely deaf former Austine boarding student.  She attended Austine between the years of 1990-2002, usually boarding from Sunday night to Friday afternoon.  Austine is a private, non-profit corporation organized and existing under the laws of the state of Vermont with a principal place of business in Brattleboro, Vermont.

Austine hired Dolph, a/k/a "John," Rehkop ("Rehkop") as part of its staff in 1996.  When hired, Rehkop was a 27-year old college graduate.  In August 1998, Rehkop was assigned or promoted to a position as behavioral support specialist.  Rehkop's duties then included, among other things, disciplining students.  Rehkop had access to most school buildings, and was allowed to have unsupervised meetings with students.

A.  Alleged Inappropriate Conduct

Plaintiff alleges that the first time Rehkop acted

---

reply that Defendant's statements of undisputed facts should be deemed unopposed where Plaintiff has denied statements contained in her amended complaint, interrogatory responses, and deposition testimony without citing any contrary sworn testimony.  Fed. R. Civ. P. 56(e) provides that: "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, . . . ."  Thus, the Court overrules Plaintiff's objections to Defendant's statements of facts where Plaintiff has not opposed Defendant's pleading with competent evidence.

4

inappropriately towards her was in the spring of 1999 during a semi-formal outing to an Asian restaurant, located approximately thirty minutes from Austine. This outing included six female students including Plaintiff, Rehkop, and another Austine staff member chaperone named Melissa Vigilante. Plaintiff alleges that Rehkop touched her inappropriately and flirted with her at the restaurant. This behavior occurred as Plaintiff and Rehkop were seated at a large table while a chef prepared food at the table. The table was in the shape of a "U," and people seated at the table could see each other without obstruction. Rehkop was seated near Plaintiff, although Plaintiff does not recall who was sitting on either side of her.

Plaintiff alleges that Rehkop began to tease her, and "get on her case," at the restaurant, but she could not recall specifically what he said. She alleges that Rehkop also touched her inappropriately on the arm as he attempted to get her attention. Although it is customary in the deaf community to tap a person on the shoulder to gain that person's attention, Plaintiff felt that Rehkop touched her inappropriately because he was rubbing up and down the side of her upper arm. She testified, however, that at the time of the outing she thought

5

that Rehkop's behavior might have been inadvertent or that "he was just trying to be sweet."

The next time that Rehkop behaved in an inappropriate manner occurred during that same evening after Plaintiff had returned to Austine from the restaurant. Plaintiff alleges that she went to the dining room in the high school girl's dormitory to work on her homework. After an unspecified amount of time passed, Rehkop came to see her. Rehkop had a "very serious expression" on his face and Plaintiff thought that she was in trouble. Rehkop touched Plaintiff on the shoulder to get her attention and said "you need to come with me to the office now." Rehkop then took Plaintiff to the dorm R.A. office, also located within the high school girl's dormitory. They walked to the office without conversation. Plaintiff cannot recall whether Rehkop had to unlock the office before entering.[2]

Inside the office, Rehkop sat behind the desk with Plaintiff seated in a chair in front of the desk. Plaintiff cannot recall how close to the desk she was seated. She was wearing a black

_____

[2]In her affidavit, filed in support of her opposition to the motion for summary judgment, Plaintiff states that "[o]nce inside the office, Mr. Rehkop closed the door behind us. There was paper covering the windows of the office, so nobody could see inside." Daroczi Aff., ¶ 3.

6

dress with a white checker pattern that came about halfway up her thigh. After Plaintiff sat down, they engaged in "typical conversation." She does not recall how long this conversation lasted. After a period of time, Rehkop stood up, walked around the desk to the front, leaned against the desk, and rested his elbow on the desk with his head in his hand. At this point, Rehkop began to flirt with Plaintiff, which Plaintiff described as winking at her and looking at her "from head to toe, up and down." Plaintiff cannot recall how many times Rehkop winked at her. She described Rehkop's "looking [her] up and down" as seeing Rehkop's eyes lustfully look at her face and then travel down her body to her feet. She cannot recall how many times Rehkop did this, but claims it was more than once.

Plaintiff alleges that Rehkop then asked her to "open her legs" to which Plaintiff said "no." Rehkop then urged her to comply saying "come on, come on" to which she again said "no." Plaintiff alleges that Rehkop then asked her if she wanted to touch his "big dick." As Rehkop was saying this, he put his hands on his pants as if he was going to unbutton his pants.[3]

---

[3]Plaintiff states in her affidavit that Rehkop "also put his hands on his pants as if he were going to expose himself" to her. Daroczi Aff., ¶ 3. In that same paragraph, she adds that Rehkop was taller, heavier and presumably stronger than she was. Id.

Plaintiff again said "no" and Rehkop stopped.  Rehkop did not unbutton his pants.  Plaintiff alleges that the conversation then went on to "other things," which she cannot recall.

Plaintiff alleges that before she left the office Rehkop told her not to tell anyone about what occurred during their meeting, and that if she did he would get back at her by reporting to Austine officials that Plaintiff's relationship with an Austine student, who was over 18-years old, was continuing in secret.  Plaintiff was either 13 or 14-years old at that time. Plaintiff testified that she had already gotten into trouble because of her relationship with that boyfriend, and that her boyfriend had been reported to SRS, which is an abbreviation for Vermont Department of Social and Rehabilitative Services. Plaintiff was concerned that her boyfriend might go to jail if Rehkop  disclosed that the relationship had continued.  There were no witnesses to the meeting between Rehkop and Plaintiff.

Following the incident in the dorm R.A. office, Plaintiff alleges that Rehkop winked at her in the hallway.  Plaintiff cannot recall how many times this occurred, but claims that it was more than once.[4]  After Rehkop winked at her, which was

_____

[4]Plaintiff changed her deposition testimony to reflect at page 138, line 16, that "The winking and <u>flirting</u> incidents

8

whenever she walked past him, Rehkop would go back to acting normally. Plaintiff could not recall Rehkop taking any other actions that she considered inappropriate.

Plaintiff did not complain to Rehkop, or anyone else, about Rehkop touching her on the arm at the restaurant in the spring of 1999. She did not tell anyone at Austine about Rehkop's conduct in the dorm R.A.'s office until September 16, 1999. On that date, Plaintiff told Ina Schaeffer, an Austine counselor, about the office meeting with Rehkop. By that time, Rehkop no longer worked at Austine. Plaintiff admits that she never told anyone at Austine that Rehkop would wink at her, and she does not know if anyone saw Rehkop wink at her in the hallway.

Plaintiff testified that she expected that Rehkop would get into trouble if she reported his conduct in the dorm R.A.'s office to school officials. Austine had trainings at the beginning of every year where students were taught to report problems with inappropriate conduct to John Fish or Ms. Schaeffer, who were persons in positions of authority. While those trainings focused on inappropriate conduct by students

_____

occurred more than once." See Def. Reply to Pl.'s Statement of Disputed Material Facts, Ex. D (emphasis added). There is no mention or description of any additional Rehkop "flirting" in the record. The Court does not credit that conclusory allegation.

9

toward each other, not by staff directed toward students, Plaintiff complained to Ms. Schaeffer about Rehkop's conduct.

Plaintiff testified that she did not report Rehkop's behavior prior to September 16, 1999 for the following reasons: (1) she was afraid that Rehkop would reveal that she continued to see the significantly older student and that the student would be disciplined; (2) she was afraid that she would be punished for continuing the relationship with that student; (3) she worried that people would think badly of her because of her relationship with the older student; and (4) she worried that Rehkop would make up stories about her that were not true, but that would get her into trouble at school.

B. Plaintiff's Alleged Injuries

During discovery, Defendant requested in its third interrogatory that Plaintiff: "list and describe in detail each and every mental, emotional, or nervous condition, as well as each and every injury, illness or physical condition, you claim to have suffered as a result of those incidents alleged in your Amended Complaint." Plaintiff answered: "As a result of the incidents alleged in her Amended Complaint, [Plaintiff] has had nightmares, flashbacks, and other manifestations of emotional

10

distress." Pl.'s Resp. to Def.'s Interrog. No. 3. Plaintiff testified at her deposition that she has bad dreams related to Rehkop and that she sometimes feels that Rehkop is looking over her shoulder and she gets momentarily scared; and that if she goes into, or near the staff office in the high school girls dormitory, she is bothered by "flashbacks" and "visions of what happened there." Plaintiff testified that she had bad dreams about Rehkop pretty often but that she could not recall how many times. She alleged that her dreams included images of Rehkop threatening her with a knife, or placing a noose around her neck. Plaintiff also testified that she has bad memories of Rehkop when she watches a movie that depicts a "very similar experience to mine," or when she is "not really focusing on one thing."[5]

Plaintiff alleges in her affidavit that at the time Rehkop harassed her and attempted to molest her, she felt embarrassed and ashamed and was particularly afraid that Rehkop would attack her, even though she had rejected his sexual advances. Daroczi

---

[5]Plaintiff added to her deposition testimony at page 151, line 14, that: "In addition to the nightmares, lost sleep and fear I continue to experience, I also suffered from nightmares, lost sleep, fear, flashbacks, embarrassment, and shame in the past." Def. Reply to Pl.'s Statement of Disputed Material Facts, Ex. D. She stated in her errata sheet that the reason for the change was "confusion about question, including reference to present tense."

11

Aff., ¶ 4. She alleges that she continues to suffer from nightmares, insomnia, flashbacks, fear, and feelings of embarrassment and shame even after Rehkop left Austine in September 1999. Id., ¶ 5. She states that the only reason that she did not leave Austine before 2002 was because she felt that her then-boyfriend, another Austine student, could protect her. Id. That boyfriend graduated from Austine in the spring of 2002. Id. Plaintiff transferred from Austine the following fall.

Plaintiff admits that she has received no treatment and has taken no medications for any of the alleged problems that she experienced as a result of Rehkop's conduct. Plaintiff has not disclosed any expert witnesses in support of her claims of emotional distress. Plaintiff also admits that her experiences with Rehkop have not stopped her from engaging in any activities.

III. Motion to Strike

   A.   Plaintiff's Deposition Errata Sheet

Defendant argues that Plaintiff impermissibly attempts to alter and amend her prior sworn testimony both at deposition and via interrogatory in her errata sheet. In particular, Defendant argues that Plaintiff has substantially amended her version of how Rehkop asked her to engage in sexual contact, and the impact

12

of Rehkop's conduct on her.

Although Defendant complains that Plaintiff made her errata sheet changes after Defendant moved for summary judgment, there is no question that Plaintiff's errata sheet was timely under the rules. The only issue before the Court is whether or not Plaintiff's substantive changes to her deposition testimony violated Rule 30(e), which provides that:

> If requested by the deponent or a party before completion of the deposition, the deponent shall have 30 days after being notified by the officer that the transcript or recording is available in which to review the transcript or recording and, if there are changes in <u>form or substance</u>, to sign a statement reciting such changes and the reasons given by the deponent for making them.

Fed. R. Civ. P. 30(e) (emphasis added). Defendant argues that the substantive changes that Plaintiff makes in her errata sheet violate Rule 30(e), citing <u>Greenway v. Int'l Paper Co.</u>, 144 F.R.D. 322 (W.D. La. 1992), as support. In <u>Greenway</u>, the court found that:

> The purpose of Rule 30(e) is obvious. Should the reporter make a substantive error, i.e., he reported "yes" but I said "no," or a formal error, i.e., he reported the name to be "Lawrence Smith" but the proper name is "Laurence Smith," then corrections by the deponent would be in order. The Rule cannot be interpreted to allow one to alter what was said under oath. If that were the case, one could merely answer the questions with no thought at all then return home

13

and plan artful responses.  Depositions differ from
interrogatories in that regard.  A deposition is not a
take home examination.

Id. at 325.

The holding in Greenway on the application of Rule 30(e) is

not controlling and is not followed by this court.  Other courts

have held that the plain language of the rule only requires that

"the deponent abide by a restricted time frame for making the

changes and recite the reasons for any changes."  Elwell v.

Conair, Inc., 145 F. Supp. 2d 79, 88 (D. Me. 2001) (quoting Great

N. Storehouse, Inc. v. Peerless Ins. Co., 2000 WL 1901266 at *2

(D.Me. Dec. 29, 2000)).  In Elwell, the court criticized the

reasoning in Greenway as unpersuasive emphasizing that in

addition to the errata sheet changes, the deponent's original

answers may be provided to the jury, and that jurors should be

able to discern the artful nature of the changes.  Elwell, 145 F.

Supp. 2d at 87; see also, Tingley Sys. v. CSC Consulting, Inc.,

152 F. Supp. 2d 95, 119-120 (D. Mass. 2001) (finding that the

express language of Rule 30(e) allows a deponent to change the

substance of his answers, and that the deponent need only provide

a non-conclusory reason for doing so).  At least one noted

commentator has urged that the interpretation applied by the

14

court in Elwell is the better view.  See 7 James Wm. Moore, et al., Moore's Federal Practice, § 30.63[3] (3rd ed. 2003) ("Although it is unseemly to see a deponent 'rewriting' deposition testimony, the prior (presumably less advantageous) testimony is not expunged from the record.  The deponent can be cross-examined about the changes and impeached by the inconsistency, with the finder of fact invited to determine that the initial reaction was the honest reaction.").  After a review of the conflicting authorities on this issue, the Court denies Defendant's motion to strike the portions of Plaintiff's errata sheet cited above in the notes.

B.    Plaintiff's Affidavit Filed In Support of Her Objection

Similar to its argument supporting the motion to strike portions of Plaintiff's errata sheet, Defendant argues that it is inappropriate and impermissible for a party opposing a motion for summary judgment, such as the Plaintiff here, to "spice up" her prior deposition testimony through an affidavit.  The First Circuit has found that "[w]hen an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory

15

explanation of why the testimony is changed." <u>Colantuoni v.</u> <u>Alfred Calcagni & Sons</u>, 44 F.3d 1, 4-5 (1st Cir. 1994); <u>see also</u>, <u>Morales v. A.C. Orssleff's EFTF</u>, 246 F.3d 32, 35 (1st Cir. 2001) (a party may not create an issue of fact simply by submitting a subsequent contradictory affidavit); <u>Torres v. E.I. Dupont de</u> <u>Nemours & Co.</u>, 219 F.3d 13, 20-21 (1st Cir. 2000) (post-summary judgment affidavit that contradicted sworn deposition testimony did not indicate that there was confusion at the time of the deposition or that the prior testimony was in error). This language does not mean, however, that all changes to a party's testimony are prohibited. The court has held that it would be an abuse of discretion to disregard an affidavit pertaining to previously identified incidents that are merely described with more specificity in the affidavit. <u>Hernandez-Loring v.</u> <u>Universidad Metropolitana</u>, 233 F.3d 49, 55 (1st Cir. 2000).

Although the Plaintiff's affidavit is perhaps close to the line, the Court does not find that the testimony in Plaintiff's affidavit clearly contradicts her prior sworn testimony, or that it describes any completely new incidents. Although the Plaintiff did reply "I think that's it, I guess" and "That's it" in response Defendant's counsel's question asking "Other than bad

16

dreams, feeling like Rehkop is looking over your shoulder, and occasional flashbacks or bad memories, are there any other problems you attribute to Rehkop?" the Court does not find that Plaintiff's response precluded her from adding any additional details regarding the incidents that she complained of or the harm that she suffered in her affidavit. See Hinkley v. Baker, 122 F. Supp. 2d 57, 59 n.1 (D. Me. 2000) (finding that answering "Yes" to a deposition question inquiring whether a deponent had disclosed all bad or offensive conduct did not foreclose the deponent from providing additional details regarding the alleged incidents of abuse in a subsequent affidavit). Here, the Plaintiff's affidavit elaborates on the circumstances surrounding the incidents that she previously been described. To the extent that Plaintiff's subsequent elaboration undermines her credibility, she may be confronted with her deposition testimony at trial. With regard to Plaintiff's description of the injuries that she suffered, Plaintiff's affidavit repeats the changes to her deposition testimony, which this Court has already found permissible under Rule 30(e). Accordingly, the Court denies Defendant's motion to strike portions of Plaintiff's affidavit.

17

C.    Plaintiff's Statement of Additional Material Facts

Defendant argues that Plaintiff's statement of additional material facts contains "gross misrepresentations" of the testimony given by Amanda Schauer, Noella Kolash, Samantha Turner and Nicole Woods, former Austine students who also claim to have been harassed or molested by Rehkop.[6]  More significantly, Defendant argues that these facts "are not in any way 'material' to the legal argument posed by Defendant's motion for summary judgment, which focuses solely on Ms. Daroczi's allegations concerning Mr. Rehkop's conduct towards her, the harm she allegedly suffered as a consequence, and the standard of proof necessary to prevail at trial for such claims."  Def.'s Reply to Pl.'s Statement of Disputed Material Facts at 35.

Defendant does not state affirmatively in its moving papers that it does not contest for purposes of summary judgment the Plaintiff's allegation that Defendant was negligent.  To the contrary, Defendant disputes Plaintiff's allegation that Defendant knew or should have known of Rehkop's propensity to engage in sexual misconduct.  See Def.'s Mem. of Law at 2.

_____

[6]Defendant did not to support its challenge to Plaintiff's statement of additional material facts with any citations to competent evidence.

18

Defendant then denies legal responsibility for any such conduct by Rehkop. Id. Plaintiff's statement of additional material facts, in part discussing claims by other Austine students of harassment and molestation by Rehkop from 1997 to 1999 and Austine's notice of those claims, are relevant to the issue of whether Austine was negligent in hiring, retaining and supervising Rehkop. In light of Austine's disavowal of any responsibility for Rehkop's conduct in its moving papers, the Court finds unpersuasive Defendant's argument that Plaintiff's additional statement of material facts should be struck from the record; the motion to strike is denied. For purposes of consideration of the motion for summary judgment, the Court finds that Defendant has not contested by appropriate record support Plaintiff's claim that Austine either knew, or should have known, about the risk of Rehkop engaging in the sexual misconduct alleged in Plaintiff's Amended Complaint.

IV. Motion for Summary Judgment

   A. Choice of Law

In determining what state law applies in a diversity action, such as this, a federal district court applies the forum state's choice of law rules. Lexington Ins. Co. v. Gen. Accident Ins.

19

<u>Co. of Am.</u>, 338 F.3d 42, 46 (1st Cir. 2003).

> When New Hampshire is the forum for a suit in which one
> or more other States also have an interest, we treat
> potential conflicts of law as follows: we first decide
> whether a relevant law is substantive or procedural; if
> it is substantive, we determine whether it actually
> conflicts with the laws of another interested State; if
> it is procedural, we generally apply our own law.

<u>Keeton v. Hustler Magazine</u>, 549 A.2d 1187, 1191 (N.H. 1988). The issue of whether this Court should apply the law of New Hampshire or Vermont to the Plaintiff's negligence claims is substantive. As such, the Court must determine whether an actual conflict exists in the law of the two states.

Defendant argues that there is no conflict between the laws of New Hampshire and Vermont with regard to the proof required for Plaintiff's claim for damages for negligently caused emotional distress. Plaintiff disputes Defendant's assertion arguing that unlike New Hampshire law, there is no requirement under Vermont law that a plaintiff offer expert testimony to recover damages for negligently caused emotional distress.

Having carefully reviewed the amended complaint and the parties' summary judgment papers, the Court has determined that the parties have briefed an issue that is not even before the court. There is no claim for damages in the Plaintiff's

20

complaint based on either "negligently caused emotional distress," or "negligent infliction of emotional distress." Rather, in all three counts of Plaintiff's amended complaint she seeks damages based on Defendant's alleged direct liability, in negligence, for damages caused by the intentionally tortious acts of Defendant's employee. The Court finds no actual conflict between the laws of New Hampshire and Vermont with regard to claims alleging direct liability for damages based on negligent hiring, retention, or supervision. Under the law of either state, the Court finds that the Plaintiff has raised a genuine issue for trial on the Defendant's liability, and that Plaintiff need not offer expert testimony in order to recover damages.

The Supreme Court of New Hampshire recognized claims based on negligent hiring, retention, and supervision in a context closely analogous to that before the Court. In Marquay v. Eno, 662 A.2d 272, 281 (N.H. 1995), court found that a school has a duty not to hire or retain employees that it knows or should know have a propensity for sexually abusing students. "Where the plaintiff can establish that the school knew or reasonably should have known of such a propensity, the school will generally be liable for the foreseeable sexual abuse of students by that

21

employee." Id.; see also, <u>Trahan-Laroche v. Lockheed Sanders</u>, 657 A.2d 417, 419 (N.H. 1995) (a principal may be found directly liable for damages resulting from the negligent supervision of its agents' activities).

Similarly, Vermont courts have recognized that a principal or master has a duty to exercise reasonable care to supervise or control his agent or servant if he knows or should know of the need for exercising such control, and has the opportunity to do so. <u>See</u> <u>Brueckner v. Norwich Univ.</u>, 730 A.2d 1086, 1093 (Vt. 1999) (finding that a principal may be found directly liable for damages resulting from negligent supervision of its agents' activities and citing <u>Trahan-Laroche</u>, 657 A.2d at 419); <u>Kennedy v. Roman Catholic Diocese</u>, 921 F. Supp. 231, 234 (D. Vt. 1996) (finding that the defendant's exercise of control of some activities of its priests did not impose a legal duty to protect the plaintiff absent some notice that a priest accused of sexual abuse might engage in the volitional criminal acts at issue); <u>Bradley v. H.A. Manosh Corp.</u>, 601 A.2d 978, 981 (Vt. 1991) ("If the actor is a servant upon his master's premises, a duty to act reasonably to control that servant's actions arises if the master has knowledge of (1) ability to control, (2) need to control, and

22

(3) opportunity to control that servant."). Although the Court has not located any Vermont case that has decided a claim based on alleged negligent hiring or retention, the Supreme Court of Vermont has implied that such claims are valid under Vermont law. See Huminski v. Lavoie, 787 A.2d 489, 520-521 (Vt. 2001) (finding that plaintiff's complaint alleging, among other things, negligent hiring and supervision, required more thorough analysis to determine whether the claims were subject to the doctrine of absolute prosecutorial immunity); Doe v. Doe, 768 A.2d 1291, 1292-93 (Vt. 2001) (reversing an order of summary judgment in defendant's favor in a case where plaintiff alleged that she was sexually abused by a state employee and stated claims based on, among other things, negligent hiring and supervision).

In a claim for damages based on negligent hiring, retention or supervision, the defendant is liable for all foreseeable damages caused by the defendant's employee or agent. Marquay, 662 A.2d at 281. Recoverable damages for an intentional assault, for example, may include the plaintiff's pain and suffering caused by the assault without the necessity for support by expert testimony. In a recently decided case, the Supreme Court of New Hampshire expressly found that damages for mental suffering are

23

recoverable without the necessity of showing actual physical injury or offering expert testimony in cases alleging the intentional tort of assault if the damage is of a kind that normally results from an assault and reasonable in extent. Silva v. Warden, N.H. State Prison, No. 2003-196, 2003 WL 23008815 at *2 (N.H. Dec. 24, 2003) (citing Fischer v. Hooper, 732 A.2d 396, 402 (N.H. 1999); see also, Restatement, Second, Torts § 905, Cmt. on Clause (b) ("The principal element of damages in actions for battery, assault or false imprisonment, . . ., is frequently the disagreeable emotion experienced by the plaintiff."); Restatement, Second, Torts § 907, Cmt. b. ("Nominal damages can be awarded when the defendant has invaded an interest of the plaintiff protected against nonharmful conduct of the sort committed by the defendant and no harm has been proved.").

The Court finds unpersuasive the Defendant's argument that Plaintiff's claim for emotional distress damages should be found precluded under Thorpe v. Department of Corrections, 575 A.2d 351 (N.H. 1990), because she has not identified an expert witness. It is true that the court in Thorpe held that expert testimony is required "in all negligence cases where emotional distress damages are claimed." Id. at 354. But while Defendant's

24

argument appears to be correct on its face, it is only deceptively so.  Plaintiff's claim against the Defendant is based on a negligence theory, but Plaintiff does not allege that her injuries were "negligently caused."  Rather, Plaintiff seeks to hold the Defendant directly liable for injuries that she suffered as a result of Defendant's employee's intentionally tortious conduct.  The Court finds <u>Thorpe</u> distinguishable in that the plaintiff in that case did not allege that he was subjected to intentional wrongdoing.  Since the Defendant's motion for summary judgment addresses a claim that was not pled in this action, there is no basis for granting the Defendant summary judgment.

V.   <u>Conclusion</u>

For the reasons set forth above, Defendant's motion to strike (document no. 27) is denied, and Defendant's motion for summary judgment (document no. 19) is denied.

**SO ORDERED.**

_____
James R. Muirhead
United States Magistrate Judge

Date: January 28, 2004

cc:   John A. Houlihan, Esq.
      Charles P. Bauer, Esq.
      Katherine M. Strickland, Esq.
      Pietro J. Lynn, Esq.